**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRUCE RAUNER, Governor of the State of Illinois, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| MARK JANUS, MARIE QUIGLEY, | ) |
| and BRIAN TRYGG, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) Case No. 1:15-cv-01235 |
| v. | ) Hon. Judge Robert W. Gettleman |
| | ) Magistrate Daniel G. Martin |
| | ) |
| AMERICAN FEDERATION OF STATE, COUNTY, | ) |
| AND MUNICIPAL EMPLOYEES COUNCIL 31, | ) |
| AFL-CIO; TEAMSTERS DOWNSTATE ILLINOIS | ) |
| STATE EMPLOYEE NEGOTIATING COMMITTEE; | ) |
| TEAMSTERS LOCAL 700, AFFILIATED WITH | ) |
| THE INTERNATIONAL BROTHERHOOD OF | ) |
| TEAMSTERS COOK COUNTY; LOCAL #330, | ) |
| GENERAL CHAUFFEURS, SALES DRIVERS AND | ) |
| HELPERS (FOX VALLEY) INCLUDING | ) |
| TEAMSTERS LOCAL 705; GENERAL | ) |
| TEAMSTERS/ PROFESSIONAL & TECHNICAL | ) |
| EMPLOYEES LOCAL UNION NO. 916; | ) |
| INTERNATIONAL UNION OF BAKERY, | ) |
| CONFECTIONERY AND TOBACCO WORKERS; | ) |
| INTERNATIONAL BROTHERHOOD OF | ) |
| BOILER MAKERS – IRON SHIPBUILDERS, | ) |
| BLACKSMITHS, FORGERS, AND HELPERS; | ) |
| ILLINOIS STATE BRICKLAYERS AND ALLIED | ) |
| CRAFTWORKERS; UNITED BROTHERHOOD OF | ) |
| CARPENTERS AND JOINERS OF AMERICA (ON | ) |
| BEHALF OF CHICAGO REGIONAL COUNCIL OF | ) |
| CARPENTERS, MID-CENTRAL ILLINOIS | ) |
| REGIONAL COUNCIL, ST. LOUIS MISSOURI | ) |
| DISTRICT COUNCIL); INTERNATIONAL | ) |
| BROTHERHOOD OF ELECTRICAL WORKERS; | ) |
| SERVICE EMPLOYEES INTERNATIONAL UNION, | ) |
| LOCAL 1, FIREMAN AND OILERS DIVISION; | ) |
| INTERNATIONAL UNION OF UNITED FOOD | ) |
| AND COMMERCIAL WORKERS; LABORER'S | ) |

INTERNATIONAL UNION OF NORTH AMERICA;   )
INTERNATIONAL ASSOCIATION OF MACHINIST  )
AND AEROSPACE WORKERS; INTERNATIONAL  )
UNION OF OPERATING ENGINEERS;   )
INTERNATIONAL UNION OF PAINTERS AND   )
ALLIED TRADES; UNITED ASSOCIATION OF   )
JOURNEYMEN AND APPRENTICES OF THE   )
PLUMBING AND PIPEFITTING INDUSTRY OF  )
U.S.A. AND CANADA; METROPOLITAN   )
ALLIANCE OF POLICE, CHAPTER 294;   )
INTERNATIONAL ASSOCIATION OF SHEET  )
METAL, AIR, RAIL, & TRANSPORTATION   )
WORKERS (SMART); ILLINOIS NURSES   )
ASSOCIATION; SERVICE EMPLOYEES   )
INTERNATIONAL UNION, LOCAL 73;   )
LABORERS' INTERNATIONAL UNION OF   )
NORTH AMERICA – ILLINOIS STATE   )
EMPLOYEES ASSOCIATION, LOCAL 2002 AND )
THE SOUTHERN AND CENTRAL ILLINOIS  )
LABORERS' DISTRICT COUNCIL; ILLINOIS  )
FEDERATION OF PUBLIC EMPLOYEES,   )
LOCAL 4408, AFT/IFT; ILLINOIS FEDERATION )
OF TEACHERS, AFL-CIO LOCAL #919;   )
CONSERVATION POLICE LODGE, IL PBPA; IL )
FRATERNAL ORDER OF POLICE – LABOR  )
COUNCIL; TROOPERS' LODGE NO. 41, FOP,  )
   )
         Defendants,   )
   )
LISA MADIGAN, Attorney General of   )
the State of Illinois; PEOPLE OF THE STATE OF )
ILLINOIS, 
   )
         Intervenors.   )

## FIRST AMENDED COMPLAINT

Plaintiff Governor Bruce Rauner (the "Governor") and newly joined Plaintiffs Mark

Janus, Marie Quigley, and Brian Trygg (collectively, "Employees"), state and reallege as

follows:

1

## NATURE OF ACTION

### Governor Rauner

1.     The Governor brings this action to resolve a controversy between his office and the various public sector labor unions named as Defendants in this case (the "Unions") regarding the legality of the Governor's Executive Order 15-13. The Governor issued the Executive Order to address the unconstitutionality of a provision contained within certain collective bargaining agreements that state agencies have entered into with the Unions, as currently permitted by the Illinois Public Labor Relations Act ("IPLRA"), 5 ILCS 315/6.

2.     It is the Governor's sworn duty to faithfully execute the laws and support the United States and Illinois Constitutions. Under the IPLRA, it is currently permissible for collective bargaining agreements covered by the IPLRA to require state employees who are not full members of the Unions ("nonmembers") to pay what are called "fair share" union fees. *See* 5 ILCS 315/6.

3.     As currently permitted by the IPLRA, the Illinois Department of Central Management Services ("CMS"), an agency within the direction and control of the Governor, has entered into collective bargaining agreements that require the deduction of "fair share" fees from the earnings of the nonmembers, with the fees then paid to the contracting unions (hereinafter, "Fair Share Contract Provisions").

4.     The constitutionality of such provisions was first considered by the United States Supreme Court in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). However, since *Abood*, the Supreme Court has repeatedly acknowledged that compelling a state employee to financially support a public sector union seriously impinges upon free speech and association interests protected by the First Amendment of the United States Constitution.

5.     More recently, in *Harris v. Quinn*, __ U.S. __, 134 S. Ct. 2618 (2014), a

majority of the Supreme Court outlined an interpretation of the First Amendment that, in light of the current circumstances of Illinois public sector collective bargaining, is incompatible with nonmembers being compelled to pay "fair share" fees such as those required by the Fair Share Contract Provisions.

6.     In light of these circumstances, the Governor has concluded these nonmember fee deductions are coerced political speech, in violation of the First Amendment of the United States Constitution. Pursuant to his oath of office under article XIII, section 3 of the Illinois Constitution, and his duty to execute the laws under article V, section 8 of the Illinois Constitution, the Governor cannot condone this unconstitutional coercion of speech.

7.     Under the Supremacy Clause contained in Article VI of the United States Constitution, the First Amendment supersedes any inconsistent purported requirements within Illinois statutes, thus rendering *ultra vires* any public union collective bargaining agreement provision that would violate nonmembers' First Amendment rights.

8.     The Governor has thus promulgated Executive Order 15-13, which directs CMS to suspend the deduction and remittance of fees imposed by the Fair Share Contract Provisions.

9.     The Unions' legal interests are adverse to the Governor's interests and obligations under the Illinois and U.S. Constitutions, in light of the unconstitutionality of the Fair Share Contract Provisions, because, pursuant to Executive Order 15-13, the Governor has directed CMS to suspend such deductions, thereby preventing the Unions from collecting fees under those provisions.

10.     The Governor therefore seeks a declaratory judgment that deducting fees under the Fair Share Contract Provisions from the earnings of nonmember public employees is

unconstitutional under the First Amendment of the United States Constitution, and that Executive Order 15-13 was within the Governor's powers under the Illinois Constitution. The Governor also seeks a declaration that performance under the collective bargaining agreements is impossible due to the unconstitutionality of the Fair Share Contract Provisions and his non-performance is therefore excused.

### Non-Union, Public Employees

11.     Mark Janus, Marie Quigley, and Brian Trygg (the "Employees") are employed by the State of Illinois. They are each exclusively represented by one of the Defendant unions (the "Unions"), but they are not members of the Unions. The Employees are being forced to pay compulsory union fees as a condition of their employment pursuant to the Illinois Public Labor Relations Act ("IPLRA"), 5 ILCS 315/6.

12.     The Employees submit that this collection of compulsory fees from them violates their rights under the First Amendment to the United States Constitution. They seek a declaratory judgment against the State and Unions to this effect; injunctive relief that prohibits the State and Unions from seizing compulsory fees from them in the future; a declaratory judgment that Executive Order 15-13 is constitutional; and damages from the Unions for compulsory fees wrongfully seized from them.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction to adjudicate the Governor's claims pursuant to 28 U.S.C. § 1331, because they arise under the United States Constitution. This Court has supplemental jurisdiction over any state law issues pursuant to 28 U.S.C. § 1367. This Court has the authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief.

14.     This Court has jurisdiction over the Employees' claims pursuant to 28 U.S.C. § 1331, because they arise under the United States Constitution, and 28 U.S.C. § 1343,

because Employees seek relief under 42 U.S.C. § 1983. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief and other relief based thereon.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Employees' and the Governor's claims arise in this judicial district. A number of Unions reside within this district pursuant to Section 1391(c)(2) and (d), because they conduct their business and have offices within the Northern District of Illinois, including but not limited to: (a) American Federation of State, County, and Municipal Employees Council 31; (b) Teamsters Local 700; and (c) United Brotherhood of Carpenters and Joiners of America, Chicago Regional Council of Carpenters. All of the other Defendants are residents of Illinois.

16.     Further, a substantial part of the events giving rise to this action took place in this judicial district because, among other reasons, some of the state employees who have been subject to the improper Fair Share Contract Provision deductions work and/or reside within the district.

## PARTIES

17.     Plaintiff Bruce Rauner is the Governor of the State of Illinois and its chief executive officer.

18.     Plaintiff Mark Janus resides in Sangamon County, Illinois. He is employed by Illinois' Department of Healthcare and Family Services in a bargaining unit exclusively represented by AFSCME Council 31. However, Janus is not a member of the Union.

19.     Plaintiff Marie Quigley resides in Sangamon County, Illinois. She is employed by Illinois' Department of Public Health in a bargaining unit exclusively represented by AFSCME Council 31. However, Quigley is not a member of the Union.

20.     Plaintiff Brian Trygg resides in Edgar County, Illinois. He is employed by Illinois' Department of Transportation in a bargaining unit exclusively represented by Teamsters

Local 916. However, Trygg is not a member of the Union.

21.     American Federation of State, County, and Municipal Employees Council 31 ("AFSCME Council 31"), AFL-CIO, is a labor union that exclusively represents over 35,000 public employees in Illinois, and has an office located at 205 N. Michigan Ave., Suite 2100, Chicago, Illinois 60601.

22.     Teamsters Downstate Illinois State Employee Negotiating Committee is a labor union representing certain employees in collective bargaining covering all Illinois counties excluding Cook, DuPage, Kane, Kankakee, Kendall, Lake, McHenry, and Will, who represents more than 1,400 employees under the jurisdiction of the Governor, including but not limited to highway workers, and temporary snow and ice workers, with an office located at 7101 North Allen Road, Peoria, Illinois 61614.

23.     Teamsters Local 700, Affiliated with the International Brotherhood of Teamsters Cook County, represents more than 600 employees under the jurisdiction of the Governor, including but not limited to state police master sergeants, highway workers, and temporary snow and ice workers, with an office located at 1300 West Higgins Road, Suite 301, Park Ridge, Illinois 60068.

24.     Local No. 330, General Chauffeurs, Sales Drivers and Helpers (Fox Valley), including Teamsters Local 705, represents more than 200 employees under the jurisdiction of the Governor, including but not limited to highway workers, and temporary snow and ice workers, with an office located at 2400 Big Timber Road, Building B, Suite 201, Elgin, Illinois 60123.

25.     General Teamsters/Professional & Technical Employees Local Union No. 916 ("Teamsters Local 916") is a labor union that exclusively represents over 2,700 public

employees in Illinois, and has an office located at 3361 Teamster Way, Springfield, Illinois 62702.

26.     International Union of Bakery, Confectionery, and Tobacco Workers represents two employees under the jurisdiction of the Governor, including but not limited to bakers, with an office located at 7310 West 39th Street, Suite 200, Lyons, Illinois  60534.

27.     International Brotherhood of Boilermakers – Iron Shipbuilders, Blacksmiths, Forgers, and Helpers represents more than 10 employees under the jurisdiction of the Governor, including but not limited to boiler safety specialists, with an office located at 2941 South Archer Avenue, Chicago, Illinois  60608.

28.     Illinois State Bricklayers and Allied Craftworkers represents four employees under the jurisdiction of the Governor, including but not limited to bricklayers, with a mailing address located at 7 North High Street, Suite 401, Post Office Box 347, Belleville, Illinois 62222.

29.     United Brotherhood of Carpenters and Joiners of America (on behalf of Chicago Regional Council of Carpenters, Mid-Central Illinois Regional Council, St. Louis Missouri District Council) represents more than 120 employees under the jurisdiction of the Governor, including but not limited to carpenters, with an office located at 300 South Ashland, Room 102, Chicago, Illinois  60607.

30.     International Brotherhood of Electrical Workers represents more than 140 employees under the jurisdiction of the Governor, including but not limited to electricians, with an office located at 8174 Cass Avenue, Darien, Illinois  60561.

31.     Service Employees International Union, Local 1, Fireman and Oilers Division, represents more than 130 employees under the jurisdiction of the Governor, including but

not limited to stationary firemen, with an office located at 111 East Wacker Drive, 25th Floor, Chicago, Illinois 60601.

32.     International Union of United Food and Commercial Workers represents more than 40 employees under the jurisdiction of the Governor, including but not limited to barbers, with an office located at 10400 West Higgins Road, Suite 500, Rosemont, Illinois 60018.

33.     Laborer's International Union of North America represents more than 20 employees under the jurisdiction of the Governor, including but not limited to laborers, with an office located at 8770 West Bryn Mawr Avenue, Suite 1212, Chicago, Illinois 60631.

34.     International Association of Machinist and Aerospace Workers represents four employees under the jurisdiction of the Governor, including but not limited to machinists, with an office located at 16W361 South Frontage Road, Suite 127, Burr Ridge, Illinois 60527.

35.     International Union of Operating Engineers represents more than 440 employees under the jurisdiction of the Governor, including but not limited to stationary engineers, with an office located at 2260 South Grove Street, Chicago, Illinois 60616.

36.     International Union of Painters and Allied Trades represents more than 80 employees under the jurisdiction of the Governor, including but not limited to painters, with an office located at 1456 West Adams Street, Chicago, Illinois 60607.

37.     United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of U.S.A. and Canada, represents more than 130 employees under the jurisdiction of the Governor, including but not limited to plumbers, with an office located at 45 North Ogden Avenue, Chicago, Illinois 60607.

38.     Metropolitan Alliance of Police, Chapter 294, represents over 10 employees

under the jurisdiction of the Governor, including but not limited to internal security investigators at the Illinois Department of Corrections, with an office located at 215 Remington Boulevard, Suite C, Bolingbrook, Illinois 60440.

39.     International Association of Sheet Metal, Air, Rail, & Transportation Workers (SMART), represents two employees under the jurisdiction of the Governor, including but not limited to tinsmiths, with an office located at 4550 Roosevelt Road, Hillside, Illinois 60162.

40.     Illinois Nurses Association represents more than 1,200 employees under the jurisdiction of the Governor, including but not limited to Registered Nurses and correctional nurses, with an office located at 105 West Adams, Suite 1420, Chicago, Illinois 60603.

41.     Service Employees International Union, Local 73, represents over 40 employees under the jurisdiction of the Governor, including but not limited to blasting specialists, military security police, and military crash fire and rescue employees, with an office located at 300 South Ashland Avenue, Suite 400, Chicago, Illinois 60607.

42.     Laborers' International Union of North America – Illinois State Employees Association, Local 2002 and the Southern and Central Illinois Laborers' District Council, represents over 300 employees under the jurisdiction of the Governor, including but not limited to shift commanders, forensic science administrators, and automotive shop supervisors, with an office located at 534 South 2nd Street, Suite 201, Springfield, Illinois 62701.

43.     Illinois Federation of Public Employees, Local 4408, American Federation of Teachers/Illinois Federation of Teachers, represents over 850 employees under the jurisdiction of the Governor, including but not limited to site superintendents, security officers, mechanics, and meat and poultry inspectors, with an office located at 4 Lawrence Square, Springfield, Illinois 62704.

44.     Illinois Federation of Teachers, AFL-CIO Local #919, represents over 40 employees under the jurisdiction of the Governor, including but not limited to teachers at the Illinois School for the Deaf, with an office located at 500 Oakmont Lane, P.O. Box 390, Westmont, Illinois 60559.

45.     Conservation Police Lodge, associated with the Illinois Police Benevolent and Protective Association, represents over 100 employees under the jurisdiction of the Governor, including but not limited to conservation police officers, with an office located at 840 South Spring Street, Suite A, Springfield, Illinois 62704.

46.     Illinois Fraternal Order of Police – Labor Council represents over 10 employees under the jurisdiction of the Governor, including but not limited to conservation police sergeants, with an office located at 974 Clock Tower Drive, Springfield, Illinois 62704.

47.     Troopers Lodge No. 41, Fraternal Order of Police, represents over 1,500 employees under the jurisdiction of the Governor, including but not limited to troopers, special agents, and lieutenants employed at the Illinois State Police, with an office located at 5880 South Sixth Street Road, Springfield, Illinois 62703.

## FACTS

I.     **Common Allegations**

A.     **The Governor's Constitutional Obligations**

48.     The Governor has the duty to faithfully execute the laws and support the United States and Illinois Constitutions, as recognized in both his sworn oath of office under article XIII, section 3 of the Illinois Constitution, and in the recognition of his "supreme executive power" in article V, section 8.

49.     Accordingly, the Governor is charged with performing his duties so as to protect the First Amendment rights of freedom of expression and association of all people in the

State of Illinois. Those duties include an obligation to faithfully support the rights of state employees to engage in, or refrain from, political speech, including speech on issues concerning public sector labor relations.

50.    The Governor is also responsible for the State's contracts with the Unions, including the collective bargaining agreements that contain Fair Share Contract Provisions.

**B.    The Illinois Public Labor Relations Act and Fair Share Contract Provisions**

51.    Section 6 of the IPLRA, 5 ILCS 315/6, recognizes the rights of covered employees to engage in self-organization and collective bargaining through a chosen representative, or other concerted activities not otherwise prohibited by law, for the purpose of collective bargaining or other mutual aid or protection.

52.    Under Section 6 of the IPLRA, a labor union designated "as the representative of the majority of public employees in an appropriate unit in accordance with the procedures herein or recognized by a public employer as the representative of the majority of public employees in an appropriate unit is the exclusive representative for the employees of such unit." 5 ILCS 315/6(c).

53.    Section 6 of the IPLRA also recognizes the rights of covered employees to refrain from such activities. 5 ILCS 315/6(a).

54.    Under Section 6 of the IPLRA, nonmembers can be required to pay certain fees under Fair Share Contract Provisions. Specifically, Section 6 provides that a collective bargaining agreement may include "a provision requiring employees covered by the agreement who are not members of the organization to pay their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment." 5 ILCS 315/6(e).

55.    Even those nonmembers who object to the payment of the so-called "fair

11

share" fees because of bona fide religious beliefs may nonetheless "be required to pay an amount equal to their fair share, determined under a lawful fair share agreement, to a nonreligious charitable organization mutually agreed upon by the employees affected and the exclusive bargaining representative to which such employees would otherwise pay such service fee." 5 ILCS 315/6(g).

### C. CMS's Collective Bargaining Agreements with the Unions

56.    CMS  has entered into  collective bargaining agreements with the Unions containing the Fair Share Contract Provisions described above, with such deductions then paid to the Unions. 5 ILCS 315/6(e); *see, e.g.*, *AFSCME Master Contract 2012-2015*, Art. IV Sec. 3, *available at* http://www2.illinois.gov/cms/Employees/Personnel/Documents/emp _afscme1.pdf (last visited Jan. 30, 2015).

57.    The Unions represent over 45,000 state employees collectively, or about 93% of the state employees covered by the Unions' bargaining agreements, including, among others, managers, attorneys, accountants, economists, and actuaries.

58.    The fees paid by nonmembers are not to exceed the amount of dues uniformly required by members, and the organizations must certify to the employer that the deductions do not exceed the dues uniformly required by members. 5 ILCS 315/6(e).

59.    AFSCME states in a publicly-posted document entitled "Notice to All Nonmember Fair Share Fee Payors" that, among other uses, its "fair share" fees are used for "[l]obbying for the negotiation, ratification or implementation of a collective bargaining agreement," "[p]aying technicians in labor law, economics and other subjects for services used (a) in negotiating and administering collective bargaining agreements, and (b) in processing grievances," "[s]upporting and paying affiliation fees to other labor organizations which do not negotiate the collective bargaining agreements governing the fair share payor's employment,"

12

"[o]rganizing within the bargaining unit in which fair share fee payors are employed,"

"[o]rganizing other bargaining units," "[s]eeking to gain representation rights in units not

represented by AFSCME," and "[l]obbying for purposes other than the negotiation, ratification

or implementation of a collective bargaining agreement."[1]

60.     AFSCME's fair share fees constitute approximately 79% of the total dues

charged to members.

61.     ISEA Laborers Local 2002's fair share fees constitute approximately 99% of

the total dues charged to members.

62.     Teamsters Local 916's fair share fees constitute approximately 98% of the

total dues charged to members.

63.     Teamsters Downstate's fair share fees constitute approximately 98% of the

total dues charged to members.

64.     Upon information and belief, the remaining Unions collect fair shares fees that

amount to between 79% and 100% of the total dues charged to members.

65.     According to recent pay records, approximately 6,582 out of 46,573 Illinois

State employees covered by collective bargaining agreements have chosen to be nonmembers

yet are compelled to fund the Unions' activities under the Fair Share Contract Provisions.

66.     Since 2004, the Unions have negotiated wage increases of approximately

80% during collective bargaining negotiations. By comparison, total inflation over the same

time period was approximately 26%, and private sector employee salaries increased by a total of

31%.

67.     Under the current collective bargaining agreements negotiated by the Unions,

---

[1]     The document entitled "Notice to All Nonmember Fair Share Fee Payors" is attached as
Exhibit 1.

the State pays on average $1,181 per employee for premiums on individual health care coverage, yet requires its employees to contribute only 12% toward the payment of those premiums.

68.     Union wages and benefits are largely funded with state general fund revenues, and, therefore, the compensation packages secured by Unions have contributed to a staggering structural budget deficit.

69.     Additionally, a state government employee represented by the Unions who earns an average annual salary of $38,979 over the course of a 26-year state government career contributes approximately $40,539 to the State's pension system, but is entitled to receive $821,588 over a twenty-year retirement, plus retiree health care.

70.     In fiscal year 2015, general fund pension costs total over $7.5 billion, which consumes 24% of state-source general fund revenues, and the overall unfunded liability of the pension system is now in excess of $111 billion.

71.     As a result of the State's deficits, the State must implement emergency financial measures that could include reduced or eliminated state services, among other consequences.

72.     When Unions expend dollars collected pursuant to the Fair Share Contact Provisions to lobby or bargain against reductions to their own benefits packages or to shift more significant reductions to other state programs or services, there is no principled distinction between the Unions and the various special interest groups who must expend money on political activities to protect their own favored programs and services.

73.     Indeed, the significant impact that Illinois public sector labor costs have imposed and will continue to impose on the State's financial condition clearly demonstrates the degree to which Illinois state employee collective bargaining is an inherently political activity.

14

74. When a union collects compulsory fees from an employee, it must annually provide the employee with a "Hudson" notice that, among other things, explains how the union calculated the fee. *See Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). A union calculates a compulsory fee by first defining which types of activities it will deem "chargeable" and "non-chargeable" to nonmember employees, and by then determining what percentage of the union's expenses in a prior fiscal year were chargeable and non-chargeable. The compulsory fee is set at the prior fiscal year's chargeable percentage.

75. The above calculation must be based on an audit of union expenditures. However, auditors do not confirm whether the union has properly classified its expenditures as chargeable or non-chargeable.

76. If a nonmember disagrees with a union's classification of expenses as chargeable, the nonmember may challenge the classification either through arbitration or in a court of law.

77. On information and belief, rather than sending individual *Hudson* notices to every employee, AFSCME Local 31 posts a "Notice to All Nonmember Fair Share Fee Payors" ("AFSCME Notice") on union bulletin boards in some workplaces.

78. On information and belief, the attached AFSCME's Notice is the current notice posted by AFSCME Council 31, and is the basis for the compulsory fees it collected in 2014 and through 2015 to date. Also on information and belief, the attached AFSCME Notice accurately describes AFSCME Council 31's compulsory fee, its calculation thereof, and the union's policies related to those fees.

**D. Unconstitutionality of Fair Share Contract Provisions**

79. In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), the United States Supreme Court considered and approved "fair share" provisions under a public sector labor contract. But since *Abood*, the Supreme Court has repeatedly recognized that compelling a

15

state employee to financially support a public sector union seriously impinges upon the free speech and association interests protected by the First Amendment.

80.     The Supreme Court in *Abood* distinguished between "chargeable" union expenditures, which may be recouped even from employees who choose not to join a union, and "non-chargeable" expenditures, which can be recouped only from the union's members.

81.     But in the years following the *Abood* decision, the Supreme Court "struggled repeatedly with" interpreting *Abood* and determining what qualified as a "chargeable" expenditure and what qualified as a "non-chargeable," or political and ideological, expenditure. *Harris v. Quinn*, _U.S. _, 134 S. Ct. 2618, 2633 (2014) (citing *Ellis v. Railway Clerks*, 466 U.S. 435 (1984); *Teachers v. Hudson*, 475 U.S. 292 (1986); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991); *Locke v. Karass*, 555 U.S. 207 (2009)).

82.     In addition, in *Knox v. Service Employees International Union, Local 1000*, __ U.S. __ , 132 S. Ct. 2277, 2289 (2012), the Supreme Court also recognized that "a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences." For that reason, "compulsory fees constitute a form of compelled speech and association that imposes a significant impingement on First Amendment rights." *Id.* (internal quotation marks omitted). *Knox* emphasized the "general rule" that "individuals should not be compelled to subsidize private groups or private speech." *Id.* at 2295.

83.     Most recently, in *Harris v. Quinn*, the Supreme Court held that "fair share" contract provisions entered into under the IPLRA that required non-union Medicaid-funded home-care personal assistants to pay fees to the union violated the First Amendment, because the provisions served no compelling state interest that could not be achieved through significantly less restrictive means. *See Harris*, 134 S. Ct. at 2640.

16

84. Even though *Harris* did not involve the employees represented by the Unions in this suit, a majority of the Supreme Court disagreed with the legal and factual bases of *Abood*'s ruling that state employees may be compelled to pay "fair share" fees, such as those required by the Fair Share Contract Provisions.

85. Regarding the "fair share" provisions at issue in that case, the *Harris* majority noted that "'[t]he primary purpose' of permitting unions to collect fees from nonmembers . . . is 'to prevent nonmembers from free-riding on the union's efforts, sharing the employment benefits obtained by the union's collective bargaining without sharing the costs incurred.'" *Harris*, 134 S. Ct. at 2627 (quoting *Knox*, 132 S. Ct. at 2289). The Court continued, however, that "'[s]uch free-rider arguments . . . are generally insufficient to overcome First Amendment objections.'" *Harris*, 134 S. Ct. at 2627 (quoting *Knox*, 132 S. Ct. at 2289).

86. A majority of the Supreme Court also recognized in *Harris* that "fair share" provisions in public employee collective bargaining agreements impose First Amendment concerns not necessarily presented in the private sector, because the collective bargaining process *itself* is political when taxpayer funds go to pay the negotiated wages and benefits, especially given the great power of unions in electoral politics and the size of public employee payrolls. In coordination with their express political advocacy, the Unions routinely take positions in the collective-bargaining process that greatly affect the State's budget.

87. Since *Abood* and since the inception of Illinois public-sector bargaining in 1984 under IPLRA, the facts and circumstances of Illinois public-sector bargaining have caused the Fair Share Contract Provisions to impose a significant infringement on the First Amendment rights of Illinois state employees who do not wish to become members of the Unions.

88. Like the petitioners in *Harris*, the nonmembers in Illinois have "the right not to

17

be forced to contribute to the union, with which they broadly disagree." *Harris*, 134 S. Ct. at 2640.

### E. Executive Order 15-13

89.     In light of the developments in the Supreme Court regarding the constitutionality of Fair Share Contract Provisions, the Governor has therefore concluded that these provisions, while permitted by the IPLRA, are nonetheless unconstitutional because they significantly infringe on nonmember Illinois state employees' First Amendment rights, while serving no compelling state interest that cannot be achieved through means significantly less restrictive of associational and expressive freedoms.

90.     There is no justification, much less a compelling one, for mandating that the nonmembers support the Unions, which are some of the most powerful and politically active organizations in the State.

91.     In addition, the inherently political nature of collective bargaining and its consequences in Illinois have further infringed on nonmembers' First Amendment rights to refrain from supporting public sector unions in their organization and collective bargaining activities. Therefore, the First Amendment forbids coercing any money from the nonmembers to pay fees pursuant to Fair Share Contract Provisions.

92.     Under article V, section 8 and article XIII, section 3 of the Illinois Constitution, the Governor is charged with performing his duties so as to protect the First Amendment rights of freedom of expression and association of all people in the State of Illinois. Because deducting fees pursuant to the Fair Share Contract Provisions is unconstitutional under the First Amendment, the Governor has determined that he cannot continue deducting these fees without violating his oath of office and duty to protect the First Amendment rights of all people in the State of Illinois.

## II.  Employees' Allegations

### A.  Employee Plaintiffs Are Forced to Pay Compulsory Union Fees Pursuant to State Law and Union Contracts.

93.     Section 6 of IPLRA, 5 ILCS 315/6, grants a designated or recognized union the legal authority to act as "the exclusive representative for the employees of [a bargaining] unit for the purpose of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment not excluded by Section 4 of this Act." 5 ILCS 315/6(c). These terms and conditions of employment include, among other things, health care coverage, retirement benefits, and pensions.

94.     The mandatory and permissive subjects of collective bargaining under the IPLRA concern matters of political and public concern over which employees and other citizens may have divergent views and opinions.

95.     The State, by and through CMS, directly deducts compulsory fees, in the amount set by a union, from the earnings of State employees and remits those monies to the union. The Unions here act under color of state law by causing, participating in, and accepting the compulsory deduction of fees from monies owed to nonmember State employees.

96.     On information and belief, exclusive representation is not necessary to maintain order and peace amongst employees in public workplaces because, among other things, public employers have other means to ensure workplace discipline.

97.     On information and belief, exclusive representation assists unions with recruiting and retaining members because, among other things: employees are more likely to join and support a union that has authority over their terms of employment, as opposed to a union that does not; exclusive representatives are entitled to information about all employees in the unit; and exclusive representatives can negotiate contract terms that facilitate recruiting and

retaining members, such as contract terms requiring mandatory union orientations for all employees and automatic deduction of union dues from employees' paychecks.

98.     Section 6(e) of the IPLRA provides that:

> When a collective bargaining agreement is entered into with an exclusive representative, it may include in the agreement a provision requiring employees covered by the agreement who are not members of the organization to pay their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment, as defined in Section 3(g), but not to exceed the amount of dues uniformly required of members. The organization shall certify to the employer the amount constituting each nonmember employee's proportionate share which shall not exceed dues uniformly required of members. In such case, the proportionate share payment in this Section shall be deducted by the employer from the earnings of the nonmember employees and paid to the employee organization.

5 ILCS 315/6(e). The union fee seizures authorized by § 6(e) of the IPLRA shall hereinafter be referred to as "compulsory fees."

99.     The State, acting through CMS, is a party to a collective bargaining agreement with AFSCME Council 31 effective from June 30, 2012 to June 30, 2015, which is incorporated by reference herein.[2] The contract requires semi-monthly deduction of compulsory fees from the earnings of nonmember employees. *Id.* at Art. IV, § 3.

100.    The State, acting through CMS, is a party to a collective bargaining agreement with Teamsters Local 916 effective from June 30, 2012 to June 30, 2015, which is incorporated by reference herein.[3] The contract requires that compulsory fees be deducted from the earnings of nonmember employees. *Id.* at Art. III, § 1.

101.    Since times before June 30, 2012, the Employees have had compulsory fees deducted from their earnings pursuant to the aforementioned contracts.

102.    Janus currently has $23.48 deducted from his paycheck every pay period, and

---

[2]     The document is available at http://www2.illinois.gov/cms/Employees/Personnel/ Documents/emp_afscme1.pdf (last visited Mar. 16, 2015), and is attached as Exhibit 2.

[3]     The document is available at http://www2.illinois.gov/cms/Employees/Personnel/ Documents/emp_pt916.PDF (last visited Mar. 16, 2015), and is attached as Exhibit 3.

estimates that several thousand dollars of compulsory fees have been deducted in total.

103.     Quigley currently has approximately $19.75 deducted from her paycheck every pay period, and estimates that approximately $1,660 of compulsory fees have been deducted in total.

104.     Trygg currently has $60.86 deducted from his paycheck every pay period, and estimates that approximately $7,100 of compulsory fees have been deducted in total.

105.     Section 6(f) of the IPLRA requires that "[w]here a collective bargaining agreement is terminated, or continues in effect beyond its scheduled expiration date pending the negotiation of a successor agreement . . . the employer shall continue to honor and abide by any dues deduction or fair share clause contained therein until a new agreement is reached including dues deduction or a fair share clause." 5 ILCS 315/6(f).

106.     Accordingly, Illinois law requires that the Employees continue to pay compulsory fees to AFSCME Council 31 and Teamsters Local 916 after the aforementioned contracts expire.

107.     On information and belief, compulsory fees are not necessary to maintain order or labor peace in the workplace, because, among other reasons, exclusive representation does not depend on the right to collect a fee from non-members.

**B.       The Employees Oppose Being Forced to Pay Compulsory Fees to the Unions.**

108.     Janus objects to many of the public-policy positions that AFSCME advocates, including the positions that AFSCME advocates for in collective bargaining.

109.     For example, he does not agree with what he views as the union's one-sided politicking for only its point of view. Janus also believes that AFSCME's behavior in bargaining does not appreciate the current fiscal crises in Illinois and does not reflect his best interests or the interests of Illinois citizens.

110.    But for Illinois law requiring compulsory fees, Janus would not pay any fees or otherwise subsidize AFSCME.

111.    Quigley also objects to many of AFSCME's public-policy positions, including the positions that AFSCME advocates for in collective bargaining.

112.    For example, she disagrees with AFSCME's negotiation of contract terms that favor seniority over employee merit for purposes of layoffs and promotions, is concerned about the effect that AFSCME's bargaining behavior is having on the Illinois budget, believes that union representatives are only looking out for themselves at the expense of union members and the people of Illinois, and does not believe that AFSCME is acting in her best interest or in the best interests of Illinois citizens.

113.    But for Illinois law requiring compulsory fees, Quigley would not pay any fees or otherwise subsidize AFSCME.

114.    Trygg objects to many of Teamsters Local 916's public-policy positions, including the positions that it advocates for in collective bargaining.

115.    Trygg has sincere religious objections to associating with Teamsters Local 916 and its agenda. Trygg also believes that Teamsters Local 916 harms Illinois residents by objecting to efforts by the State to reduce costs that would allow public funds to be made available for more important uses. For example, the Union resists any furlough days, despite the State's budget issues.

116.    But for Illinois law requiring compulsory fees, Trygg would not pay any fees or other subsidize Teamsters Local 916.

### III.    Governor's Executive Action

117.    An actual controversy currently exists between the parties concerning the constitutionality of the Fair Share Contract Provisions and the legality of the Governor's

Executive Order ceasing such deductions.

118.    Article V, section 8 of the Illinois Constitution says that "[t]he Governor shall have the supreme executive power" of the State of Illinois. That power includes the authority to select and direct agency leaders, including the head of CMS. For purposes of the Illinois Public Labor Relations Act [5 ILCS 315/6], employees who have the right to "join or assist any labor organization, to bargain collectively" are "[e]mployees of the State." They are also considered employees of the State of Illinois for payroll purposes. The agencies they work for are similar to divisions of a company. Their employer is still the State of Illinois.

119.    As the State's chief executive, the Governor has delegated the authority to bargain with the labor unions to the labor division of CMS, but his office still directs those negotiations and makes final decisions on all material terms in the agreement. CMS does not have the authority to agree to final terms without the Governor's approval.

120.    The decision to no longer comply with a term of the contract was the Governor's. The Governor directed State Agencies to no longer comply, and they did not have any discretion because the Governor has the "supreme executive power."

121.    Executive Order 15-13 renders null and void certain provisions in the collective bargaining contracts between CMS and Defendants. CMS's obedience to Executive Order 15-13 necessarily creates a controversy with Defendants, which will no longer receive these payments. That controversy exists without limitation by virtue of the federal question concerning the constitutionality of Executive Order 15-13, the injury suffered to the office of the Governor from any legal effort to curtail the Governor's exclusive power to issue Executive Orders, and the Governor's status as an employer in the State of Illinois.

122.    Executive Order 15-13 is based on the unconstitutionality of the Fair Share

Contract Provisions. The Order is in direct conflict with the terms of Defendants' collective bargaining agreements, which require the continued deduction and remittance of those fees. This controversy is substantial, between parties having adverse legal interests, and sufficiently real and immediate to warrant the issuance of a declaratory judgment.

123.    The Defendants have already sued the Governor to demonstrate the existence of the ongoing controversy. That lawsuit has been filed in the Circuit Court of Illinois, St. Clair County and is incorporated herein by reference. That lawsuit demonstrates both the existence of a case or controversy as well as an injury specific to the Governor as the State's supreme executive and status as an employer.[4]

124.    Because Executive Order 15-13 renders null and void certain provisions within the collective bargaining contracts between CMS and all Defendants, and because those provisions purported to impose upon CMS the obligation to make payroll deductions and remittances to Defendants for the benefit of Defendants, CMS's required obedience to Executive Order 15-13 necessarily entails a controversy between Defendants and the Governor, by virtue of CMS being an agency reporting to the Governor.

125.    The Governor has a substantial legal interest in resolving such a controversy immediately in order to expeditiously achieve finality and certainty that will, among other things:

      a.   Establish the lawfulness of Executive Order 15-13, an order uniquely within the purview of Illinois' chief executive;

      b.   Prevent potentially costly distractions to CMS personnel, to bargaining unit personnel ultimately reporting to the Governor who are affected by

---

[4]    The Verified Complaint for Declaratory and Injunctive Relief, dated March 5, 2015, is attached as Exhibit 4.

Executive Order 15-13, and to other Executive Branch personnel reporting to the Governor, resulting from a protracted and public dispute between the Governor and Defendants regarding the legal validity of Executive Order 15-13;

c. Prevent the possible unnecessary expense and inefficiency that could result from an extended period in which the Executive Branch commits itself to the implementation of Executive Order 15-13, only to have its validity thrown into question by multiple challenges from the various separate and independent Defendant unions;

d. Establish the validity of Executive Order 15-13 so as to insulate Executive Branch employees in agencies reporting to the Governor from any wrongful assertions by Defendants that such employees still individually owe fair share amounts because Defendants do not recognize Executive Order 15-13;

e. Prevent lawsuits or threatened liability against the employees of the Governor or state agencies;

f. Obtain certainty whether the Governor's non-performance under the otherwise clear terms of the contracts with the Unions is lawful.

126. There is a direct conflict between the Governor's Executive Order 15-13 and the Fair Share Contract Provisions in all of Defendants' collective bargaining agreements, and a present concrete disagreement between the Governor and Defendants regarding the application of the First Amendment to Fair Share Contract Provisions.

127. For example, Defendants AFSCME and Service Employees International

Union, Local 73 have publicly announced their position that Fair Share Contract Provisions are constitutional under the First Amendment as interpreted by *Abood*. Thus, AFSCME's and Service Employees International Union, Local 73 have a concrete disagreement with the Governor on the basis for Executive Order 15-13.

128.    Specifically, Defendants AFSCME and Service Employees International Union, Local 73 argued to the United States Supreme Court in *Harris v. Quinn* that the First Amendment permits "fair share" fees charged to public sector workers who do not wish to be union members. AFSCME claimed that a system including "fair share" fees had a "limited" "impact on public employees' First Amendment rights"; that such "fees serve the government's significant interests"; and that the "burdens of the system are minimized by limits . . . to costs germane to contract negotiation and administration." Brief of Respondent SEIU Healthcare Illinois & Indiana, *Harris v. Quinn*, No. 11-681, 2013 WL 6805686, at *10-11 (U.S. Dec. 23, 2013), expressly incorporated by reference within Brief for Respondents AFSCME Council 31 and SEIU Local 73, *Harris v. Quinn*, No. 11-681, 2013 WL 6805687, at *2 (U.S. Dec. 23, 2013).

129.    On information and belief, officers of Defendants AFSCME and other Defendants have made public statements criticizing the Supreme Court's First Amendment analysis in *Harris v. Quinn*, further indicating the concrete disagreement that exists between Defendants and the Governor on the application of the First Amendment and the constitutional basis for Executive Order 15-13.

## GOVERNOR'S COUNT I

### Declaratory Judgment Of Legality Of Executive Order 15-13

130.    The Governor incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged here.

131.    An actual controversy exists between the parties. This Court has jurisdiction to enter a declaratory judgment concerning the respective rights and duties of the parties.

132.    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."

133.    The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment against the States: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

134.    Enforcing the Fair Share Contract Provisions would require the Governor to violate his duty to uphold both the United States and Illinois Constitutions.

135.    As Unions will no longer receive payments to which they are purportedly entitled under the IPLRA and various collective bargaining agreements, a clear controversy exists between the parties regarding their respective obligations under the collective bargaining agreements.

136.    Further, the Governor has a substantial legal interest in resolving these issues expeditiously in order to: (a) avoid unnecessary and costly expenses and distractions; and (b) establish the validity of Executive Order 15-13. Several of the Unions have already sued the Governor alleging that Executive Order 15-13 is unlawful under Illinois law and seeking prospective injunctive relief regarding the administration of the Fair Share Contract Provisions.

137.    It is necessary and proper under the circumstances alleged herein that this Court adjudicate and declare that: (a) the Fair Share Contract Provisions, as required under the IPLRA, impose a significant infringement on Illinois State employees' First Amendment rights

27

and serve no compelling State interest that cannot be achieved through means significantly less restrictive of associational freedoms; (b) the Governor's Executive Order 15-13 ceasing deduction and remittance of Fair Share Contract Provision fees is within the Governor's powers under the Article V, Section 8, or other provisions of the Illinois Constitution; and (c) the Governor's Executive Order 15-13 is lawful under Illinois law.

138.    The Governor has no adequate remedy at law.

**GOVERNOR'S COUNT II**

**Declaratory Judgment Of Impossibility Of Contractual Performance**

139.    The Governor incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged here.

140.    The Governor through his agencies, including CMS, has entered into Collective Bargaining Agreements with the Defendants containing Fair Share Contract Provisions.

141.    The Collective Bargaining Agreements are valid and binding agreements.

142.    The terms of the Collective Bargaining Agreements are unambiguous and the obligations regarding implementation of the Fair Share Contract Provisions are clear.

143.    Abiding by the Fair Share Contract Provisions of the Collective Bargaining Agreements would require the Governor to violate the United States Constitution.

144.    The Governor is unable to implement the Fair Share Contract Provisions under the Collective Bargaining Agreements because those provisions are unconstitutional.

145.    The Governor is entitled to a declaration that performance under the contract is impossible and his non-performance of the Fair Share Contract Provisions is therefore excused.

**GOVERNOR'S PRAYER FOR RELIEF**

WHEREFORE, the Governor respectfully requests that this Court enter an order declaring that:

(1) The Fair Share Contract Provisions under the IPLRA are unconstitutional under the First Amendment of the United States Constitution; and

(2) The Governor's Executive Order 15-13 is within the Governor's powers under the Illinois constitution.

(3) The Governor's performance under its Collective Bargaining Agreements with the Defendants is impossible because of the unconstitutionality of the Fair Share Contract Provisions, and the Governor's non-performance under the Collective Bargaining Agreements is therefore excused.

The Governor further respectfully requests that the Court grant any other relief to the Governor that the Court deems just and proper.

## EMPLOYEES' CLAIMS FOR RELIEF

146.    The Plaintiffs reallege and incorporate by reference the paragraphs set forth above.

147.    Compulsory fees infringe on the First Amendment rights of the Intervenors and other employees because compulsory fee requirements compel employees to support speech and petitioning against their will, and to associate with a union against their will.

148.    "[C]ompulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met. First, there must be a comprehensive regulatory scheme involving a 'mandated association' among those who are required to pay the subsidy." *Knox v. SEIU*, 132 S. Ct. 2277, 2289 (2012) (citation omitted). "Such situations are exceedingly rare because . . . mandatory associations are permissible only when they serve a compelling state interest . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (citation omitted).

29

149.     "Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a 'necessary incident' of the 'larger regulatory purpose which justified the required association.'" *Id.* (citation omitted).

150.     In *Abood v. Detroit v. Board of Education*, 431 U.S. 209 (1977), the Supreme Court held the seizure of compulsory fees in the public sector to be constitutional because the fees were justified by state interests in labor peace and avoiding free riders. However, the *Abood* court failed to subject these ostensible justifications to aforementioned requisite constitutional scrutiny.

151.     In *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014), a majority of the Supreme Court questioned *Abood*'s continued validity on several grounds.

152.     The Plaintiffs submit that *Abood* was wrongly decided, should be overturned by the Supreme Court, and that the seizure of compulsory fees is unconstitutional under the First Amendment. Among other things, no compelling or otherwise sufficient state interest justifies compulsory fees.

## EMPLOYEES' COUNT I

### Compulsory Union Fees Violate 42 U.S.C. § 1983 And The United States Constitution

153.     By requiring under color of state law that the Employees pay compulsory fees as a condition of their employment, the State, AFSCME Council 31, and Teamsters Local 916 are violating the Employees' First Amendment rights to free speech, petitioning, and association, as secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

154.     As a result, the Employees are suffering the irreparable harm and injury inherent in a violation of First Amendment rights for which there is no adequate remedy at law. Unless enjoined by this Court, the Employees will continue to suffer irreparable harm and

injury.

155.    The following Illinois laws that authorize compulsory fees are unconstitutional, both on their face and as applied to the Employees: 5 ILCS 315/3(g), ILCS 315/6(a) (final sentence only), 5 ILCS 315/6(e), 5 ILCS 315/6(f), 315/10(a)(2) (final sentence only), and 5 ILCS 315/10(b)(1) (reference to "fair share" only).

## EMPLOYEES' COUNT II

### Declaratory Judgment That EO 15-13 Is Constitutional

156.    Executive Order 15-13 requires that the State no longer infringe on the First Amendment rights of the Employees and similarly situated employees in the manner described in Count I. The Employee Plaintiffs seek a declaratory judgment that EO 15-13 is constitutional and that the Governor has the lawful authority to enact and implement EO 15-13.

## EMPLOYEES' PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

    a. Issue a declaratory judgment against the State, AFSCME Council 31, and Teamsters Local 916 that:

        i. it is unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, to seize or require payment of compulsory fees from the Employees and other public employees; and

        ii. the following statutory provisions are unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, and are null and void: ILCS 315/3(g), ILCS 315/6(a) (final sentence only), 5 ILCS 315/6(e), 5 ILCS 315/6(f), 315/10(a)(2) (final sentence only), and 5

ILCS 315/10(b)(1) (reference to "fair share" only).

    iii.  The sections of AFSCME Council 31 and Teamsters Local 916's contracts with the State that require the seizure of compulsory fees are unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, and are null and void.

b.  Issue preliminary and permanent injunctions against the State, AFSCME Council 31, and Teamsters Local 916 that prohibit the parties from seizing compulsory fees from the Employees or otherwise requiring that they pay compulsory fees to a union as a condition of their employment.

c.  Award Employees Mark Janus, Marie Quigley nominal and compensatory damages from AFSCME Council 31, and award Employee Brian Trygg nominal and compensatory damages from Teamsters Local 916, for all compulsory fees seized from them under color of state law from the beginning of the applicable statute of limitations to the date of the said award.

d.  Pursuant to 42 U.S.C. § 1988, award Plaintiffs their costs, including reasonable attorneys' fees incurred in the litigation of this case.

e.  Order any other legal or equitable relief deemed just and proper.

Dated: March 26, 2015               Respectfully submitted,

MARK JANUS, MARIE QUIGLEY,        BRUCE RAUNER
and BRIAN TRYGG

By: /s  Joseph J. Torres           By: /s  Matthew R. Ford

Dan K. Webb
Lawrence R. Desideri
Joseph J. Torres
Brook R. Long
WINSTON & STRAWN LLP
35 West Wacker Dr. Chicago, IL 60601
312.558.7334
312.558.5700 (fax)
dwebb@winston.com
ldesideri@winston.com
jtorres@winston.com
blong@winston.com

William L. Messenger*
Aaron B. Solem*
c/o National Right to Work Legal Defense
Foundation
8001 Braddock Rd., Suite 600
Springfield, VA 22160
703.321.8510
703.321.9319 (fax)
wlm@nrtw.org
abs@nrtw.org
Jacob H. Huebert
Jeffrey M. Schwab
Liberty Justice Center
190 S. LaSalle St, Suite 1500
Chicago, IL 60603
312.263.7668
312.263.7702 (fax)
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org


 * Pro Hac Vice Motions to Be Filed

Counsel for Plaintiffs Mark Janus,
Marie Quigley, and Brian Trygg

Philip S. Beck
Matthew R. Ford
Rebecca T. Horwitz
Special Assistant Attorneys General
BARTLIT BECK HERMAN PALENCHAR
  & SCOTT LLP
54 W. Hubbard Street
Suite 300
Chicago, IL 60654
312.494.4400
philip.beck@bartlit-beck.com
matthew.ford@bartlit-beck.com
rebecca.horwitz@bartlit-beck.com

Dennis Murashko
Special Assistant Attorney General
Deputy Counsel
Office of Governor Bruce Rauner
100 W. Randolph Street – Suite 16-100
Chicago, IL 60601
312.814.4185
dennis.murashko@illinois.gov

Counsel for Plaintiff Bruce Rauner,
Governor of the State of Illinois

## CERTIFICATE OF SERVICE

I, Matthew R. Ford, an attorney, hereby certify that on March 26, 2015, I caused the foregoing FIRST AMENDED COMPLAINT to be filed electronically with the Court via CM/ECF. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:  /s Matthew R. Ford