In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 19-1553

MARK JANUS,

*Plaintiff-Appellant,*

*v.*

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, COUNCIL 31; AFL-CIO, *et al.*,

*Defendants-Appellees,*

*and*

KWAME RAOUL, in his official capacity as Attorney General of
the State of Illinois,

*Intervenor-Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-01235 — **Robert W. Gettleman**, *Judge.*

———————————

ARGUED SEPTEMBER 20, 2019 — DECIDED NOVEMBER 5, 2019

———————————

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

WOOD, *Chief Judge*. For 41 years, explicit Supreme Court precedent authorized state-government entities and unions to enter into agreements under which the unions could receive fair-share fees from nonmembers to cover the costs incurred when the union negotiated or acted on their behalf over terms of employment. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). To protect nonmembers' First Amendment rights, fair-share fees could not support any of the union's political or ideological activities. Relying on *Abood*, more than 20 states created statutory schemes that allowed the collection of fair-share fees, and public-sector employers and unions in those jurisdictions entered into collective bargaining agreements pursuant to these laws.

In 2018, the Supreme Court reversed its prior position and held that compulsory fair-share or agency fee arrangements impermissibly infringe on employees' First Amendment rights. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2461 (2018). The question before us now is whether Mark Janus, an employee who paid fair-share fees under protest, is entitled to a refund of some or all of that money. We hold that he is not, and so we affirm the judgment of the district court.

## I

### A. History of Agency Fees

Before turning to the specifics of the case before us, we think it useful to take a brief tour of the history behind agency fees. This provides useful context for our consideration of Mr. Janus's claim and the system he challenged.

The principle of exclusive union representation lies at the heart of our system of industrial relations; it is reflected in both the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–165

(first enacted in 1926), and the National Labor Relations Act
("NLRA"), 29 U.S.C. §§ 151–169 (first enacted in 1935). In its
quest to provide for "industrial peace and stabilized labor-
management relations," Congress authorized employers and
labor organizations to enter into agreements under which em-
ployees could be required either to be union members or to
contribute to the costs of representation—so-called "agency-
shop" arrangements. See 29 U.S.C. §§ 157, 158(a)(3); 45 U.S.C.
§ 152 Eleventh. Unions designated as exclusive representa-
tives were (and still are) obligated to represent all employees,
union members or not, "fairly, equitably, and in good faith."
H.R. Rep. No. 2811, 81st Cong., 2d Sess., p. 4.

In *Railway Employment Dep't v. Hanson*, 351 U.S. 225 (1956),
a case involving the RLA, the Supreme Court held that "the
requirement for financial support of the collective-bargaining
agency by all who receive the benefits of its work is within the
power of Congress under the Commerce Clause and does not
violate either the First or the Fifth Amendments." *Id.* at 231. In
approving agency-shop arrangements, the Court said, "Con-
gress endeavored to safeguard against [the possibility that
compulsory union membership would impair freedom of ex-
pression] by making explicit that no conditions to member-
ship may be imposed except as respects 'periodic dues, initi-
ation fees, and assessments.'" *Id. Hanson* thus held that the
compulsory payment of fair-share fees did not contravene the
First Amendment.

Several years later, in *Int'l Ass'n of Machinists v. Street*, 367
U.S. 740 (1961), the Court discussed the careful balancing of
interests reflected in the RLA, observing that "Congress did
not completely abandon the policy of full freedom of choice
embodied in the [RLA], but rather made inroads on it for the

limited purposes of eliminating the problems created by the 'free rider.'" *Id.* at 767. The Court reaffirmed the lawfulness of agency-shop arrangements while cautioning that unions could receive and spend nonmembers' fees only in accordance with the terms "advanced by the unions and accepted by Congress [to show] why authority to make union shop agreements was justified." *Id.* at 768. Legitimate expenditures were limited to those designed to cover "the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes." *Id.* The Court left the question whether state public agencies were similarly empowered under state law to enter into agency-shop arrangements for another day.

That day came on May 23, 1977, when the Supreme Court issued its opinion in *Abood*. 431 U.S. 209. There, a group of public-school teachers challenged Michigan's labor relations laws, which were broadly modeled on federal law. *Id.* at 223. Michigan law established an exclusive representation scheme and authorized agency-shop clauses in collective bargaining agreements between public-sector employers and unions. *Id.* at 224. The Court upheld that system, stating that "[t]he desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller," *id.*, and that "[t]he same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue." *Id.* at 225. It recognized that "government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment." *Id.* at 233–34. Nonetheless, it said that a public employee has no "weightier First Amendment interest than a private employee in not being compelled to contribute to the

costs of exclusive union representation," *id.* at 229, and thus concluded that "[t]he differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights." *Id.* at 232.

The correct balance, according to *Abood*, was to "prevent[] compulsory subsidization of ideological activities by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Id.* at 237. And for four decades following *Abood*, courts, state public-sector employers, and unions followed this path. See, *e.g.*, *Locke v. Karass*, 555 U.S. 207 (2009); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991); *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986); *Ellis v. Railway Clerks*, 466 U.S. 435 (1984). Agency-shop arrangements, the Court repeatedly held, were consistent with the First Amendment and validly addressed the risk of free riding. See *Comm'cns Workers of America v. Beck*, 487 U.S. 735, 762 (1988) ("Congress enacted the two provisions for the same purpose, eliminating 'free riders,' and that purpose dictates our construction of § 8(a)(3) … ."); *Ellis*, 466 U.S. at 447, 452, 456 (referring in three places to the free-rider concern); see also *Lehnert*, 500 U.S. at 556 (Scalia, J., concurring).

In time, however, the consensus on the Court began to fracture. Beginning in *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298 (2012), the rhetoric changed. *Abood* began to be characterized as an "anomaly," and the Court started paying more attention to the "significant impingement on First Amendment rights" *Abood* allowed and less to the balancing of employees' rights and unions' obligations. *Id.* at 310–11. Building on *Knox*, *Harris v. Quinn* criticized the reasoning in *Hanson* and *Abood* as "thin," "questionable," and "troubling." 573 U.S. 616, 631–

35 (2014). *Harris* worried that *Abood* had "failed to appreciate the conceptual difficulty of distinguishing between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends" and to anticipate "the practical administrative problems that would result." *Id.* at 637. The *Harris* Court also suggested that "[a] union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked." *Id.* at 649.

Nonetheless, and critically for present purposes, these observations did not lead the Court in *Harris* to overrule *Abood*. Informed observers thought that *Abood* was on shaky ground, but it was unclear whether it would weather the storm, be restricted, or be overturned in its entirety. That uncertainty continued after the Court signaled its intention to revisit the issue in *Friedrichs v. California Teachers Ass'n*, 135 S. Ct. 2933 (2015), which wound up being affirmed by an equally divided Court. 136 S. Ct. 1083 (2016).

### B.  Janus's Case

Plaintiff Mark Janus was formerly a child-support specialist employed by the Illinois Department of Healthcare and Family Services. Through a collective bargaining agreement between Illinois's Department of Central Management Services ("CMS") (which handles human resources tasks for Illinois's state agencies) and defendant American Federation of State, County and Municipal Employees ("AFSCME"), Council 31, AFSCME was designated as the exclusive representative of Mr. Janus's employee unit. Mr. Janus exercised his right not to join the union. He also objected to CMS's withholding $44.58 from his paycheck each month to compensate AFSCME for representing the employee unit in collective

bargaining, grievance processing, and other employment-related functions.

Initially, however, Mr. Janus was not involved in this litigation. The case began instead when the then-governor of Illinois challenged the Illinois Public Labor Relations Act ("IPLRA"), which established an exclusive representation scheme and authorized public employers and unions to enter into collective bargaining agreements that include a fair-share fee provision. 5 ILCS § 315/6. Under that law, a union designated as the exclusive representative of an employee unit was "responsible for representing the interests of all public employees in the unit," whether union members or not, § 315/6(d). Fair-share fees were earmarked to compensate the union for costs incurred in "the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment." § 315/6(e).

The district court dismissed the governor for lack of standing, but at the same time it permitted Mr. Janus (and some others) to intervene as plaintiffs. Mr. Janus asserted that the state's compulsory fair-share scheme violated the First Amendment. He recognized that *Abood* stood in his way, but he argued that *Abood* was wrongly decided and should be overturned by the high court. Although the lower courts that first considered his case rejected his position on the ground that they were bound by *Abood*, see *Janus v. AFSCME, Council 31*, 851 F.3d 746, 747–48 (7th Cir. 2017) ("*Janus I*"), Janus preserved his arguments and then, as he had hoped, the Supreme Court took the case.

This time, the Court overruled *Abood*. *Janus,* 138 S. Ct. at 2486 ("*Janus II*"). It held that agency-shop arrangements that require nonmembers to pay fair-share fees and thereby

"subsidize private speech on matters of substantial public concern," are inconsistent with the First Amendment rights of objectors, no matter what interest the state identifies in its authorizing legislation. 138 S. Ct. at 2460. This is so, the Court explained, because "the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." *Id.* at 2467.

Several aspects of the Court's opinion are relevant to Mr. Janus's current claim for damages. First, the Court characterized the harm inflicted by the agency-fee arrangement as "compelled subsidization of private speech," 138 S. Ct. at 2464, whereby "individuals are coerced into betraying their convictions," *id.* It was not concerned in the abstract with the deduction of money from employees' paychecks pursuant to an employment contract. Rather, the problem was the lack of *consent* (where it existed) to the use of that money—*i.e.* to support the union's representation work. In other words, the case presented a First Amendment speech issue, not one under the Fifth Amendment's Takings clause.

The Court found that any legitimate interest AFSCME had in those fees had to yield to the objecting employees' First Amendment rights. In so doing, it rejected the approach to free riding that earlier opinions had taken, holding to the contrary that "avoiding free riders is not a compelling interest" and thus Illinois's statute could not withstand "exacting scrutiny." 138 S. Ct. at 2466. Yet it came to that conclusion only after weighing the costs and benefits to a union of having exclusive representative status: on the one hand, the union incurs the financial burden attendant to the requirement to

provide fair representation even for nonmembers who de-
cline to contribute anything to the cost of its services; on the
other hand, even with payments of zero from objectors, the
union still enjoys the power and attendant privileges of being
the exclusive representative of an employee unit. The Court's
analysis focused on the union rather than the nonmembers:
the question was whether requiring a *union* to continue to rep-
resent those who do not pay even a fair-share fee would be
sufficiently inequitable to establish a compelling interest, not
whether requiring *nonmembers* to contribute to the unions
would be inequitable.

Nor did the Court hold that Mr. Janus has an unqualified
constitutional right to accept the benefits of union representa-
tion without paying. Its focus was instead on freedom of ex-
pression. That is why it said only that the state may not force
a person to pay fees to a union with which she does not wish
to associate. But if those unions were not designated as exclu-
sive representatives (as they are under 5 ILCS §§ 315/6 and
315/9), there would be no obligation to act in the interests of
nonmembers. The only right the *Janus II* decision recognized
is that of an objector not to pay *any* union fees. This is not the
same as a right to a free ride. Free-riding is simply a conse-
quence of exclusivity; drop the duty of fair representation,
and the union would be free to cut off all services to the non-
members.

Finally, the Court did not specify whether its decision was
to have retroactive effect. The language it used, to the extent
that it points any way, suggests that it was thinking prospec-
tively: "Those unconstitutional exactions cannot be allowed
to continue indefinitely," 138 S. Ct. at 2486; "States and public-
sector unions may no longer extract agency fees from

nonconsenting employees," *id*; "This procedure violates the First Amendment and cannot continue," *id.* In the end, however, the Court remanded the case to the district court for further proceedings, in particular those related to remedy. *Id.* at 2486.

### C. District Court Proceedings

The most immediate effect of the Court's *Janus II* opinion was CMS's prompt cessation of its collection of fees from Mr. Janus and all other nonmembers of the union, and thus the end of AFSCME's receipt of those monies. That relief was undoubtedly welcome for those such as Mr. Janus who fundamentally disagree with the union's mission, but matters did not stop there. Still relying on 42 U.S.C. § 1983 for his right of action, Mr. Janus followed up on the Court's decision with a request for damages from AFSCME in the amount of all fair-share fees he had paid. The State of Illinois joined the litigation as an intervenor-defendant in support of AFSCME.

The district court entered summary judgment for AFSCME and Illinois on March 18, 2019. *Janus v. AFSCME, Council 31*, No. 15 C 1235, 2019 WL 1239780 (N.D. Ill. Mar. 18, 2019) ("*Janus III*"). It began with the observation that in 1982, the Supreme Court held that private defendants could in some circumstances act "under color of state law" for purposes of section 1983 by participating in state-created procedural schemes. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 941–42 (1982). Although such private defendants are not entitled to the identical immunity defenses that apply to public defendants, the Court later indicated, they may be entitled to an affirmative defense based on good faith or probable cause. *Wyatt v. Cole*, 504 U.S. 158, 169 (1992) ("*Wyatt I*"). Noting that "every federal appellate court that has considered the good-

faith defense [to a damages action] has found that it exists for private parties," the court followed that rule and found that the defense applies here. The key question, it said, is whether the defendant's reliance on an existing law was in good faith. Given the fact that "the statute on which defendant relied had been considered constitutional for 41 years," it found good faith. In so doing, it rejected the idea that earlier intimations from the Court that *Abood* ought to be overruled undermined the necessary good faith. Accordingly, it held that Mr. Janus was not entitled to damages.

Mr. Janus timely filed a notice of appeal on March 27, 2019. We heard oral argument in both Mr. Janus's appeal and a related case, *Mooney v. Ill. Educ. Ass'n*, No. 19-1774, on September 20, 2019. The predicate for each case is the same—the Supreme Court's decision in *Janus II*—but whereas Mr. Janus seeks damages from the union, Mooney insists that her claim lies in equity and is one for restitution. As we explain in more detail in a separate opinion filed in *Mooney*, we find no substantive difference in the two theories of relief, and so much of what we have to say here also applies to Mooney's case.

## II

This appeal presents only questions of law. Accordingly, we review the district court's grant of summary judgment in favor of AFSCME *de novo*. *Mazzai v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 959 (7th Cir. 2001).

### A.  Retroactivity

We begin with the question whether *Janus II* is retroactive. If it is not, that is the end of the line for Mr. Janus, because the union's collection of fair-share fees was expressly permitted by state law and Supreme Court precedent from the time he

started his covered work until the Court's decision, which all agree marked the end of his payments. If it is, then we must reach additional questions that also bear on the proper resolution of the case. As we noted earlier, the Supreme Court's opinion did not address retroactivity in so many words.

Mr. Janus relies primarily on *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993), for the proposition that "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." *Id.* at 97; see also *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995) ("*Harper*… held that, when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, whether or not those cases involve predecision events."). Mr. Janus's assertion is that *all* Supreme Court cases, without exception, "must be applied retroactively." AFSCME responds that "[i]t is not at all clear, in the first place, that the Supreme Court's decision in this case is to be applied retroactively."

We agree with AFSCME that the rules of retroactivity are not as unbending as Mr. Janus postulates. Even in *Harper*, the Court said only that its "consideration of remedial issues meant necessarily that we retroactively applied the rule we announced … to the litigants before us." 509 U.S. at 99. Right and remedy are two different things, and the Court has taken great pains to evaluate them separately. See, *e.g.*, *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 65–66 (1992) ("As we have often stated, the question of what remedies are available under a statute that provides a private right of action is

'analytically distinct' from the issue of whether such a right exists in the first place.").

Retroactivity poses some knotty problems. The Supreme Court disapproved of what it called "selective prospectivity" in *Harper* (that is, application of the new rule to the party before the court but not to all others whose cases were pending), but it did not close the door on "pure prospectivity"—*i.e.*, wholly prospective force, equally inapplicable to the parties in the case that announces the rule and all others—as used in *Lemon v. Kurtzman*, 411 U.S. 192 (1973) ("*Lemon II*"). In that case, after invalidating a Pennsylvania program permitting nonpublic sectarian schools to be reimbursed for secular educational services, see *Lemon v. Kurtzman*, 403 U.S. 602 (1971) ("*Lemon I*"), the Court affirmed a district court order permitting the state to reimburse the schools for all services performed up to the date of *Lemon I*. *Lemon II*, 411 U.S. at 194. One could argue that similar reliance interests on the part of AFSCME and the state argue for pure prospectivity here.

On the other hand, in later decisions the Supreme Court has stated that the "general practice is to apply the rule of law we announce in a case to the parties before us … even when we overrule a case." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Only when there is "grave disruption or inequity involved in awarding retrospective relief to the petitioner" does the option of pure prospectivity come into play. *Ryder v. United States*, 515 U.S. 177, 184–85 (1995). See also *Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 650 (7th Cir. 2014) (*en banc*).

Rather than wrestle the retroactivity question to the ground, we think it prudent to assume for the sake of argument that the *right* recognized in *Janus II* should indeed be applied to the full sweep of people identified in *Harper* (that is,

Mr. Janus himself and all others whose cases were in the pipeline at the time of the Court's decision). That appears also to be the approach the district court took. We thus turn to the broader question whether Mr. Janus is entitled to the remedy he seeks.

### B.   Requirements under Section 1983

Section 1983 supports a civil claim against "every person who, under color of any statute … of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

#### 1.   *AFSCME is a "person" that can be sued*

To be liable under section 1983 a defendant must be a "person" as Congress used that term. While "person" is a broad word, the Supreme Court has held that states do not fall within its compass. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). But it is hard to find other exclusions. The union, as an unincorporated organization, is a suable "person," and we are satisfied that it is sufficiently like other entities that have been sued under section 1983 to permit this action. Compare *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" for purposes of section 1983); *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 156 (5th Cir. 1980) (voluntary association of schools); *Frohwerk v. Corr. Med. Servs.*, 2009 WL 2840961 (N.D. Ind. Sept. 1, 2009) (prison contractors). *Cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

2.  *AFSCME acted "under color of" state law*

The next question is whether AFSCME acted under color of state law. Unions generally are private organizations. See, *e.g.*, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). Nonetheless, private actors sometimes fall within the statute. See *Lugar*, 457 U.S. at 935. Indeed, the "color of law" requirement for section 1983 is more expansive than, and wholly encompasses, the "state action" requirement under the Fourteenth Amendment. *Id.* For our purposes, the analysis is the same—if AFSCME's receipt from CMS of the fair-share fees is attributable to the state, then the "color of law" requirement is satisfied.

A "procedural scheme created by … statute obviously is the product of state action" and "properly may be addressed in a section 1983 action." *Id.* at 941. "[W]hen private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988); see also *Apostol v. Landau*, 957 F.2d 339, 343 (7th Cir. 1992). Here, AFSCME was a joint participant with the state in the agency-fee arrangement. CMS deducted fair-share fees from the employees' paychecks and transferred that money to the union, which then spent it on authorized labor-management activities pursuant to the collective bargaining agreement. This is sufficient for the union's conduct to amount to state action. We therefore conclude that AFSCME is a proper defendant under section 1983.

C.  Statute of Limitations

Mr. Janus's claim is also timely under the applicable statute of limitations. Section 1983 does not have its own organic

statute of limitations but rather borrows the state statute of limitations for personal-injury actions. *Wilson v. Garcia*, 471 U.S. 261, 279 (1985). In Illinois, this is two years. 735 ILCS § 5/13–202. "The claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011).

In this case, the statute began running on the date of the Supreme Court's decision in *Janus II*: June 27, 2018. Mr. Janus neither knew nor should have known any earlier that his constitutional rights were violated, because before then it was the settled law of the land that the contrary was true. Thus, his suit is timely.

## III

### A.  Existence of Good-faith Defense

We now turn to the ultimate question in this case: to what remedy or remedies is Mr. Janus entitled? As the Supreme Court wrote in *Davis v. United States*, 564 U.S. 229 (2011), retroactivity and remedy are distinct questions. "Retroactive application does not … determine what 'appropriate remedy' (if any) the defendant should obtain." *Id.* at 243; see also *American Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 189 (1990) (plurality opinion) ("[T]he Court has never equated its retroactivity principles with remedial principles…."). It thus does not necessarily follow from retroactive application of a new rule that the defendant will gain the precise type of relief she seeks. See *Powell v. Nevada*, 511 U.S. 79, 84 (1994). To the contrary, the Supreme Court has acknowledged that the retroactive application of a new rule of law does not "deprive[] respondents of their opportunity to raise … reliance interests entitled to consideration in determining the nature of the

remedy that must be provided." *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 544 (1991).

Sometimes the law recognizes a defense to certain types of relief. An example that comes readily to mind is the qualified immunity doctrine, which is available for a public employee if the asserted constitutional right that she violated was not clearly established. See, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). We must decide whether a union may raise any such defense against its liability for the fair-share fees it collected before *Janus II*.

This is a matter of first impression in our circuit. But, as the district court noted, every federal appellate court to have decided the question has held that, while a private party acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under section 1983. See *Clement v. City of Glendale*, 518 F.3d 1090, 1096–97 (9th Cir. 2008); *Pinsky v. Duncan*, 79 F.3d 306, 311–12 (2d Cir. 1996); *Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698–99 (6th Cir. 1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1275–78 (3d Cir. 1994); *Wyatt v. Cole*, 994 F.2d 1113, 1118–21 (5th Cir. 1993) ("*Wyatt II*").

Mr. Janus takes issue with this consensus position. He points to the text of section 1983, which we grant says nothing about immunities or defenses. That, he contends, is the end of the matter. "Shall be liable to the party injured" is mandatory language that, in his view, allows for no exceptions. The problem with such an absolutist position, however, is that the Supreme Court abandoned it long ago, when it recognized that liability under section 1983 is subject to common-law immunities that apply to all manner of defendants.

The Court discussed that history in *Wyatt I*, where it noted that despite the bare-bones text of section 1983, it had "accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." 504 U.S. at 163–64 (quoting *Owen v. City of Independence*, 445 U.S. 622, 637 (1980)) (internal quotation marks omitted). In *Wyatt I*, the Court had to decide how far its immunity jurisprudence reached, and specifically, whether *private* parties acting under color of state law would have been able, at the time section 1983 was enacted (in 1871), to invoke the same immunities that public officials had. (That is more than a bit counterfactual, as the Court did not recognize this type of private liability until 1982, but we put that to one side.) Surveying its immunity jurisprudence, including *Mitchell v. Forsyth*, 472 U.S. 511 (1985), *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), *Wood v. Strickland*, 420 U.S. 308 (1975), and *Pierson v. Ray*, 386 U.S. 547 (1967), the Court "conclude[ed] that the rationales mandating qualified immunity for public officials are not applicable to private parties." 504 U.S. at 167.

The Court recognized that this outcome risked leaving private defendants in the unenviable position of being just as vulnerable to suit as public officials, per *Lugar*, but not protected by the same immunity. *Id.* at 168. But, critically for AFSCME, the Court pointed toward the solution to that problem. It distinguished between defenses to suit and immunity from suit, the latter of which is more robust, in that it bars recovery regardless of the merits. *Id.* at 166. It then confirmed that its ruling rejecting qualified immunity did "not foreclose the possibility that private defendants faced with § 1983

liability under [*Lugar*] could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." *Wyatt I*, 504 U.S. at 169.

Mr. Janus rejects the line that the Court drew between qualified immunity and a defense to liability; he sees it as nothing but a labeling game. But *Wyatt I* directly refutes this criticism. Adding to the language above from the majority, Justice Kennedy, in concurrence, explained why a defense on the merits might be available for private parties even if immunity is not. "By casting the rule as an immunity, we imply the underlying conduct was unlawful, a most debatable proposition in a case where a private citizen may have acted in good-faith reliance upon a statute." 504 U.S. at 173 (Kennedy, J., concurring). The distinction between an immunity and a defense is one of substance, not just nomenclature, and "is important because there is support in the common law for the proposition that a private individual's reliance on a statute, prior to a judicial determination of unconstitutionality, is considered reasonable as a matter of law." *Id.* at 174; see also *Lugar*, 457 U.S. at 942 n.23 ("Justice Powell is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense.").

The *Wyatt I* Court remanded the case to the Fifth Circuit, which decided that the "question left open by the majority"— whether a good-faith defense is available in section 1983

actions—"was largely answered" in the affirmative by the five concurring and dissenting justices. *Wyatt II*, 994 F.2d at 1118. The court accordingly held "that private defendants sued on the basis of *Lugar* may be held liable for damages under § 1983 only if they failed to act in good faith in invoking the unconstitutional state procedures, that is, if they either knew or should have known that the statute upon which they relied was unconstitutional." *Id.*

Other circuits followed suit. In *Jordan*, the Third Circuit noted "the [Supreme Court's] statement [in *Wyatt I*] that persons asserting section 1983 claims against private parties could be required to carry additional burdens, and the statements in *Lugar* which warn us [that] a too facile extension of section 1983 to private parties could obliterate the Fourteenth Amendment's limitation to state actions that deprive a person of constitutional rights and the statutory limitation of section 1983 actions to claims against persons acting under color of law." 20 F.3d at 1277 (cleaned up). Those considerations, the court said, lead to the conclusion that "'good faith' gives state actors a defense that depends on their subjective state of mind, rather than the more demanding objective standard of reasonable belief that governs qualified immunity." *Id.* The Sixth Circuit concurred in *Vector Research*, 76 F.3d at 699, as did the Ninth Circuit in *Clement*, 518 F.3d at 1096–97. Most recently, in a case decided after *Harris v. Quinn*, the Second Circuit allowed a good-faith defense to a section 1983 claim for reimbursement of agency fees paid prior to decision. *Jarvis v. Cuomo*, 660 F. App'x 72, 75–76 (2d Cir. 2016).

Mr. Janus pushes back against these decisions with the argument that there is no common-law history before 1871 of private parties enjoying a good-faith defense to constitutional

claims. As we hinted earlier, however, the reason is simple: the liability of private parties under section 1983 was not clearly established until, at the earliest, the Court's decision in *United States v. Price*, 383 U.S. 787 (1966). For nearly 100 years, nothing would have prompted the question.

We now join our sister circuits in recognizing that, under appropriate circumstances, a private party that acts under color of law for purposes of section 1983 may defend on the ground that it proceeded in good faith. The final question is whether that defense is available to AFSCME.

### B.  Good-faith Defense for AFSCME

Although this is a new question for us, we note that every district court that has considered the precise question before us—whether there is a good-faith defense to liability for payments collected before *Janus II*—has answered it in the affirmative.[1] While those views are not binding on us, the unanimity of opinion is worth noting.

---

[1] See *Hamidi v. SEIU Local 1000*, 2019 WL 5536324 (E.D. Cal. Oct. 25, 2019); *LaSpina v. SEIU Pennsylvania State Council*, 2019 WL 4750423 (M.D. Pa. Sept. 30, 2019); *Casanova v. International Ass'n of Machinists, Local 701*, No. 1:19-cv-00428, Dkt. #22 (N.D. Ill. Sept. 11, 2019); *Allen v. Santa Clara Cty. Correctional Peace Officers Ass'n*, 2019 WL 4302744 (E.D. Cal. Sept. 11, 2019); *Ogle v. Ohio Civil Serv. Emp. Ass'n*, 2019 WL 3227936 (S.D. Ohio July 17, 2019), appeal pending, No. 19-3701 (6th Cir.); *Diamond v. Pennsylvania State Educ. Ass'n*, 2019 WL 2929875 (W.D. Pa. July 8, 2019), appeal pending, No. 19-2812 (3d Cir.); *Hernandez v. AFSCME California*, 386 F. Supp. 3d 1300 (E.D. Cal. 2019); *Doughty v. State Employee's Ass'n*, No. 1:19-cv-00053-PB (D.N.H. May 30, 2019), appeal pending, No. 19-1636 (1st Cir.); *Babb v. California Teachers Ass'n*, 378 F. Supp. 3d 857 (C.D. Cal. 2019); *Wholean v. CSEA SEIU Local 2001*, 2019 WL 1873021 (D. Conn. Apr. 26, 2019), appeal pending, No. 19-1563 (2d Cir.); *Akers v. Maryland Educ. Ass'n*, 376 F. Supp. 3d 563 (D. Md. 2019), appeal pending, No. 19-1524 (4th Cir.); *Bermudez v.*

The first task we have under *Wyatt I* is to identify the "most closely analogous tort" to which we should turn for guidance. 504 U.S. at 164 (citations and internal quotation marks omitted). Arguing in some tension with his statute-of-limitations position, Mr. Janus says that his claim lacks any common law analogue. His back-up position is that good faith is pertinent only if the underlying offense has a state-of-mind element, and he asserts that the most analogous tort in his case lacks such an element.

Mr. Janus compares the First Amendment violation in his case to conversion. But that analogy does not work, at least with regard to the state's deduction of fair-share fees and its transfer of those fees to the union. Conversion requires an intentional and serious interference with "the right of another to control" a chattel. Restatement (Second) of Torts § 222A (1965). At the time AFSCME received Mr. Janus's fair-share fees, he had no "right to control" that money. Instead, under

---

*SEIU Local 521*, 2019 WL 1615414 (N.D. Cal. Apr. 16, 2019); *Lee v. Ohio Educ. Ass'n*, 366 F. Supp. 3d 980 (N.D. Ohio 2019), appeal pending, No. 19-3250 (6th Cir.); *Hough v. SEIU Local 521*, 2019 WL 1274528 (N.D. Cal. Mar. 20, 2019), amended, 2019 WL 1785414 (N.D. Cal. Apr. 16, 2019), appeal pending, No. 19-15792 (9th Cir.); *Crockett v. NEA-Alaska*, 367 F. Supp. 3d 996 (D. Alaska 2019), appeal pending, No. 19-35299 (9th Cir.); *Carey v. Inslee*, 364 F. Supp. 3d 1220 (W.D. Wash. 2019), appeal pending, No. 19-35290 (9th Cir.); *Cook v. Brown*, 364 F. Supp. 3d 1184 (D. Or. 2019), appeal pending, No. 19-35191 (9th Cir.); *Danielson v. AFSCME, Council 28*, 340 F. Supp. 3d 1083 (W.D. Wash. 2018), appeal pending, No. 18-36087 (9th Cir.). See also *Winner v. Rauner*, 2016 WL 7374258 (N.D. Ill. Dec. 20, 2016) (post-*Harris* claim for fee reimbursement); *Hoffman v. Inslee*, 2016 WL 6126016 (W.D. Wash. Oct. 20, 2016) (same). But see *Lamberty v. Connecticut State Police Union*, 2018 WL 5115559 (D. Conn. Oct. 19, 2018) (dismissing for lack of standing but implying plaintiffs were entitled to previously withheld fees, plus interest).

No. 19-1553                                                              23

Illinois law and *Abood*, the union had a right to the fees under the collective bargaining agreement with CMS. This rules out conversion. As the Supreme Court said in *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940), "the actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored." *Id.* at 374.

There are also at least two privileges that may be relevant to a conversion-style claim: authority based upon public interest, Restatement (Second) of Torts § 265 (1965), and privilege to act pursuant to court order, Restatement (Second) of Torts § 266 (1965). Section 265 provides that "one is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority." While the usual context for the assertion of this privilege is law enforcement, it is not too much of a stretch to apply it to the union's conduct here. CMS and AFSCME acted pursuant to state law. That sounds like action in discharge of a duty imposed by law. Section 266, which provides a privilege when one acts pursuant to a court order, is not directly applicable because there was no court order directing AFSCME to receive fair-share fees—*Abood* was permissive, not mandatory. Nevertheless, CMS and AFSCME did rely on the Supreme Court's opinion upholding the legality of exactly this process.

AFSCME contends that the better analogy is to the tort of abuse of process. Abuse of process occurs where a party "uses a legal process, whether criminal or civil, against another

primarily to accomplish a purpose for which it is not designed." Restatement (Second) of Torts § 682 (1977). Alternatively, the most analogous tort might be interference with contract. See Restatement (Second) of Torts § 766A (1979). Under the agency-fee arrangement, a certain portion of the salary CMS contracted to pay employees went instead to the union. This arguably made the contract less lucrative for objecting employees and violated their First Amendment rights.

None of these torts is a perfect fit, but they need not be. We are directed to find the *most analogous* tort, not the exact-match tort. This is inherently inexact. Although there are reasonable arguments for several different torts, we are inclined to agree with AFSCME that abuse of process comes closest. But perhaps the search for the best analogy is a fool's errand. As several district courts have commented, the Supreme Court in *Wyatt I* embarked on the search for the most analogous tort only for *immunity* purposes—the Court never said that the same methodology should be used for the good-faith defense. See, *e.g.*, *Carey*, 364 F. Supp. 3d at 1229–30; *Babb*, 378 F. Supp. 3d at 872–73; *Diamond*, 2019 WL 2929875 at *25–26. In the alternative, therefore, we leave common-law analogies behind and consider the appropriateness of allowing a good-faith defense on its own terms.

### C.  Good-faith Defense under *Wyatt I*

Like our sister circuits, we read the Court's language in *Wyatt I* and *Lugar*, supplemented by Justice Kennedy's opinion concurring in *Wyatt I*, as a strong signal that the Court intended (when the time was right) to recognize a good-faith defense in section 1983 actions when the defendant reasonably relies on established law. This is not, we stress, a simple "mistake of law" defense. Neither CMS nor AFSCME made

any mistake about the state of the law during the years between 1982 and June 27, 2018, when *Janus II* was handed down. *Abood* was the operative decision from the Supreme Court from 1977 onward, until the Court exercised its exclusive prerogative to overrule that case. Like its counterparts around the country, the State of Illinois relied on *Abood* when it adopted a labor relations scheme providing for exclusive representation of public-sector workers and the remit of fair-share fees to the recognized union. The union then relied on that state law in its interactions with other actors.

We realize that there were signals from some Justices during the years leading up to *Janus II* that indicated they were willing to reconsider *Abood*, but that is hardly unique to this area. Sometimes such reconsideration happens, and sometimes, despite the most confident predictions, it does not. See, *e.g.*, *Dickerson v. United States*, 530 U.S. 428 (2000) (reaffirming the *Miranda* rule); see also *Agostini*, 521 U.S. at 237 ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent." (cleaned up)). The Rule of Law requires that parties abide by, and be able to rely on, what the law *is*, rather than what the readers of tea-leaves predict that it might be in the future.

Notably, Mr. Janus does not allege that CMS and AFSCME, acting pursuant to state law, failed to comply with *Abood*. Mr. Janus says only that AFSCME did not act in good faith because it "spurned efforts to have agency fees placed in escrow while their constitutionality was determined." But AFSCME was under no legal obligation to escrow the fair-share fees for an indefinite period while the case was being litigated. Such an action, as AFSCME says, would (in the

absence of a court order requiring security of some kind) "have been hard to square with the fiduciary duty the Union owes to its own members," as the unit's exclusive representative.

Until *Janus II* said otherwise, AFSCME had a legal right to receive and spend fair-share fees collected from nonmembers as long as it complied with state law and the *Abood* line of cases. It did not demonstrate bad faith when it followed these rules.

### D.  Entitlement to Money Damages

No one doubts that Mr. Janus is entitled to declaratory and injunctive relief. The Supreme Court declared that the *status quo* violated his First Amendment rights and that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." 138 S. Ct. at 2486. Mr. Janus is now protected from that practice. Any remaining relief was for the district court to consider. That court declined to grant monetary damages, on the ground that AFSCME's good-faith defense shielded the union from such liability. We agree with that conclusion.

While this may not be all that Mr. Janus hoped for in this litigation, it is not unusual for remedies to be curtailed in light of broader legal doctrines. Moreover, though Mr. Janus contends that he did not want any of the benefits of AFSCME's collective bargaining and other representative activities over the years, he received them. Putting the First Amendment issues that concerned the Supreme Court in *Janus II* to one side, there was no unjust "windfall" to the union, as Mr. Janus alleges, but rather an exchange of money for services. Our

decision in *Gilpin v. AFSCME*, 875 F.2d 1310 (7th Cir. 1989) is on point:

> [T]he union negotiated on behalf of these employees as it was required by law to do, adjusted grievances for them as it was required by law to do, and incurred expenses in doing these things … . The plaintiffs do not propose to give back the benefits that the union's efforts bestowed on them. These benefits were rendered with a reasonable expectation of compensation founded on the collective bargaining agreement and federal labor law, and the conferral of the benefits on the plaintiffs would therefore give rise under conventional principles of restitution to a valid claim by the union for restitution if the union were forced to turn over the escrow account to the plaintiffs and others similarly situated to them.

*Id.* at 1316.

We have followed similar principles in the ERISA context. "If restitution would be inequitable, as where the payor obtained a benefit that he intends to retain from the payment that he made and now seeks to take back, it is refused." *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 651 (7th Cir. 2001); see also *Constr. Indus. Ret. Fund of Rockford, Ill. v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) ("The welfare fund pooled the money to provide benefits for all persons on whose behalf contributions were made. Because the drivers received the health coverage for which they paid through the deductions Kasper sent to the fund, no one is entitled to restitution."); *UIU Severance Pay Tr. Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 513 (7th Cir. 1993) ("[B]ecause the cause of action we

are authorizing is equitable in nature, recovery will not follow automatically upon a showing that the Union contributed more than was required but only if the equities favor it." (internal quotation marks omitted)). We conclude that Mr. Janus has received all that he is entitled to: declaratory and injunctive relief, and a future free of any association with a public union.

## IV

Before closing, we emphasize again that the good-faith defense to section 1983 liability is narrow. It is not true, as Mr. Janus charges, that this defense will be available to "every defendant that deprives any person of any constitutional right." We predict that only rarely will a party successfully claim to have relied substantially and in good faith on both a state statute *and* unambiguous Supreme Court precedent validating that statute. But for those rare occasions, following the lead first of the Supreme Court in *Wyatt I* and second of our sister circuits, we recognize a good-faith defense for private parties who act under color of state law for purposes of section 1983.

We AFFIRM the judgment of the district court.

No. 19-1553                                                      29

MANION, *Circuit Judge*, concurring. The court's opinion in this challenging case is thorough, and I concur with the court's ultimate conclusion. I have a couple additional thoughts. Some might observe that *Abood* had some benefit to the objectors because they no longer had to pay service fees equal to union dues as a condition of employment. But for 41 years, the nonunion employees had to pay their "fair share."

The unions received a huge windfall for 41 years. As the Supreme Court acknowledged in *Janus II*, *Abood* was wrong, so the unions got what the Court called a "considerable windfall." The Court in *Janus II* sums it up pretty well:

> We recognize that the loss of payments from nonmembers may cause unions to experience unpleasant transition costs in the short term, and may require unions to make adjustments in order to attract and retain members. But we must weigh these disadvantages against the considerable windfall that unions have received under *Abood* for the past 41 years. It is hard to estimate how many billions of dollars have been taken from nonmembers and transferred to public-sector unions in violation of the First Amendment. Those unconstitutional exactions cannot be allowed to continue indefinitely.

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2485–86 (2018).

Even though the Supreme Court reached the wrong result in *Abood* 41 years before *Janus II*, the unions justify their acceptance of many millions of dollars because they accept-

ed the money in "good faith." Probably a better way of look-
ing at it would be to say rather than good faith, they had
very "good luck" in receiving this windfall for so many
years. Since the court is not holding that the unions must re-
pay a portion of the windfall, they can remind themselves of
their good luck for the years ahead.